Ruben E. GARCIA, Plaintiff,

v.

OMAHA PROPERTY AND CASUALTY INSURANCE COMPANY, a foreign corporation, and Tanenbaum–Harber Co. a/k/a Tanenbaum–Harber of Florida, Defendants.

No. 93–2471–CIV.

United States District Court, S.D. Florida.

June 22, 1995.

Virginia M. Best, Miami, FL, for plaintiff.

Paula C. Kessler, Fort Lauderdale, FL, for defendant Omaha.

Peter DeMahy, Miami, FL, for defendant Tanenbaum.

## ORDER ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT

HIGHSMITH, District Judge.

THIS CAUSE came before the Court upon the following motions:

(1) Plaintiff Ruben E. Garcia's motion for summary judgment as to both defendants (D.E. # 48);

(2) Defendant Omaha Property and Casualty Insurance Company's ("Omaha") cross-motion for summary judgment (D.E. # 60); and

(3) Defendant Tanenbaum–Harber Company's ("Tanenbaum") cross-motion for summary judgment (D.E. # 65).

For the reasons stated below, the Court denies Garcia's motion for summary judgment and grants Omaha's and Tanenbaum's cross motions for summary judgment.

### STANDARD OF REVIEW

In deciding motions for summary judgment, the Court must use as its guide the standard set forth in *Fed.R.Civ.P.* 56(c), which states in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The United States Supreme Court has addressed the standard for summary judgment, as set forth in Rule 56(c), as follows:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

After the moving party has met this initial burden, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). *Fed.R.Civ.P.* 56(e), however, does not permit the nonmoving party to avoid summary judgment by resting on the pleadings, but "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, the mere existence of a scintilla of evidence in support of the non-movant's position is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511.

### PROCEDURAL BACKGROUND

Plaintiff Ruben E. Garcia is a resident of Dade County, Florida. On August 24, 1992, Garcia's home suffered damages as a result of Hurricane Andrew. Thereafter, Garcia submitted a claim to Omaha, the insurer who had issued the flood insurance policy on Garcia's home. Omaha paid for damages to the higher floors of Garcia's three-level townhouse, but denied payment with regard to most of the damages sustained on the first level. Garcia brings this action against Omaha, and against Tanenbaum, the insurance agent through which Garcia obtained the flood insurance policy, seeking to recover the unpaid portion of the claim.

As a result of prior rulings, only the following counts remain in Garcia's six-count second amended complaint:

Count I: Claim for declaratory relief against Omaha, to determine coverage under the flood insurance policy.

Count II: Claim against Omaha for the negligent actions of its agent, Tanenbaum.

Count III: Claim for breach of contract against Omaha.

Count VI: Claim for negligent misrepresentations and omissions against Tanenbaum.

In its answer to the second amended complaint, Omaha asserts that its handling of Garcia's claim was in keeping with a directive issued by the Federal Emergency Management Agency after Hurricane Andrew. According to this directive, the homes at L'Hermitage, the development where Garcia's townhouse is located, should have been rated as "elevated buildings." Pursuant to these instructions, Omaha denied a substantial portion of Garcia's claim with respect to the first level. The other defendant, Tanenbaum, admits the allegations contained in the second amended complaint that pertain to it. Tanenbaum, however, asserts two affirmative defenses: that the flood policy provides coverage for the first floor; and that Omaha and unnamed third parties are responsible for Garcia's loss. Tanenbaum also filed a cross-claim seeking indemnity from Omaha.

In his motion for summary judgment, Garcia argues that the policy, as written, provides full coverage for damages to the first level of his home. Garcia seeks a declaration of coverage and a judgment, as a matter of law, that Omaha breached the contract of insurance. Garcia also argues that he is entitled to judgment against Tanenbaum because Tanenbaum admitted all of the allegations in the complaint. In its cross-motion for summary judgment, Omaha argues that Garcia is not entitled to coverage based on the language of the policy, the applicable federal statutes, and local ordinances, which prescribe a minimum elevation for buildings located in the area of L'Hermitage. In its cross-motion for summary judgment, Tanenbaum first argues that if coverage is found, Garcia's claim against is it moot. If, on the other hand, the Court finds that the policy does not provide coverage for Garcia's claim, then Tanenbaum argues that no liability at-

taches, since no greater coverage could have been obtained for Garcia's home than that prescribed under the National Flood Insurance Program and applicable regulations.[1]

In preparation for addressing these issues, the Court has had the benefit of oral argument from the parties. The Court has also been furnished with copies of the following opinions issued in other cases brought by residents of L'Hermitage: Final Order of Summary Judgment, issued by the Honorable James Lawrence King, United States District Judge, Southern District of Florida, on September 19, 1994, in *Kelly v. Standard Fire Ins. Co.*, Case No. 93–1916–CIV–KING; and Order on Motions for Summary Judgment, issued by the Honorable Ursula Ungaro–Benages, United States District Judge, Southern District of Florida, on September 6, 1994, in seven consolidated cases captioned under *Carneiro da Cunha v. Standard Fire Ins. Co.*, Case No. 93–1570–CIV–UNGARO–BENAGES. Finally, the Court has reviewed two other opinions furnished by the parties, addressing similar flood insurance issues: Order Granting Summary Judgment for Plaintiff and Denying Summary Judgment for Defendant, issued by the Honorable Ted E. Bandstra, United States Magistrate Judge, Southern District of Florida, on May 19, 1994, in *Holtz v. Omaha Property & Casualty Ins. Co.*, Case No. 93–2439–CIV–HURLEY; and Opinion (granting defendants' motions for summary judgment and denying plaintiffs' cross-motions for summary judgment), issued by the Honorable Anne E. Thompson, United States Chief District Judge, District of New Jersey, on December 6, 1994, in *Goldman v. Witt*, Case No. 93–5542(AET).

## THE NATIONAL FLOOD INSURANCE PROGRAM

The National Flood Insurance Program was established by Congress as a mechanism for "making flood insurance coverage avail-

---

**1.** Tanenbaum's summary judgment argument that coverage for Garcia's first floor level is limited by the National Flood Insurance regulations was not specifically raised in its answer. Because this issue was raised by Omaha, however, it presents no unfair surprise or prejudice to

Garcia. Indeed, Garcia has fully addressed this argument in his response to Tanenbaum's summary judgment motion. Therefore, to the extent necessary to correct any procedural defects, the Court deems Tanenbaum's pleading amended to reflect the foregoing defense.

able on reasonable terms and conditions to persons who have need for such protection." 42 U.S.C.A. § 4001(a) (West 1994). The Director of the Federal Emergency Management Agency ("FEMA") is charged with implementing the National Flood Insurance Program. 42 U.S.C.A. § 4011(a) (West 1994). Pursuant to this authorization, FEMA prescribes a Standard Flood Insurance Policy, which governs the issuance of flood insurance policies. *Insurance Coverage and Rates: Standard Flood Insurance Policy*, 44 C.F.R. § 61.13 and Part 61 App. A (1994). Private sector property insurance companies, denominated as "Write Your Own" companies, are authorized to issue the Standard Flood Insurance Policy. 44 C.F.R. § 61.13(f).

To qualify for flood insurance availability, a community must adopt a set of flood plain management regulations that comply with the standards prescribed in the Code of Federal Regulations. *Insurance and Hazard Mitigation: Prerequisites for the sale of flood insurance*, 44 C.F.R. § 59.22 (1994). An integral part of these regulations is the Flood Insurance Rate Map ("FIRM"), an official map of each community, which is issued by FEMA, and which delineates the special hazard areas and the risk premium zones applicable to that community. 44 C.F.R. § 59.1. Once FEMA has issued a FIRM for a particular community, all new construction and substantial improvements of residential structures in the community that fall within FIRM Zones A1–30, AE and AH must have the lowest floor (including the basement) elevated to or above the base flood level for that zone. *Criteria for Land Management and Use: Flood plain management criteria for flood-prone areas*, 44 C.F.R. § 60.3(c)(2) (1994).

For such "elevated," post-FIRM buildings, no flood insurance coverage is afforded for building enclosures, equipment, machinery, fixtures and components (except for utility connections and building support elements) or for personal property, which are located at an elevation lower than the lowest elevated floor. *Standard Flood Insurance Policy:*

*Dwelling Form*, 44 C.F.R. Part 61 App. A(1), Article 6, Section F(1). As an exception to the foregoing provision, the following items are covered, provided they are connected to a power source and functioning: sump pumps; well water tanks and pumps; oil tanks and the oil in them; cisterns and the water in them; natural gas tanks and the gas in them; pumps and or tanks used in conjunction with solar energy; furnaces; hot water heaters; clothes washers and dryers; food freezers and the food in them; air conditioners; heat pumps; electrical junction and circuit breaker boxes; stairways and staircases; elevators and dumbwaiters. *Id.*

### UNDISPUTED MATERIAL FACTS

In 1984, Garcia purchased Villa # 57, a townhouse located within the residential development known as L'Hermitage, at 2000 South Bayshore Drive, Miami, Florida. When he purchased the residence, Garcia assumed the seller's then current flood insurance policy. That same year, Garcia filed a flood insurance claim with the National Flood Insurance Program, which was paid. Upon expiration of that policy's term, Garcia continued the policy through Jose Diaz–Villalobos, an insurance agent from whom Garcia had purchased insurance in the past. At that time, the Federal Insurance Administration, which managed the National Flood Insurance Program, was the only entity providing flood insurance in the United States.[2]

Sometime in 1989, Diaz–Villalobos became associated with Tanenbaum. From that point, Diaz–Villalobos continued to service Garcia's insurance needs through Tanenbaum. That same year, Garcia's policy was "rolled over" to Omaha, as a "Write Your Own" insurer, by the Federal Insurance Administration. Thereafter, Garcia continued to renew his Omaha flood insurance policy through Tanenbaum, in its capacity as an authorized agent of Omaha. Thus, Tanenbaum acted as a dual agent, representing both Garcia and Omaha, in the procurement of the flood insurance policy.

**2.** The Federal Insurance Administration was the agency in charge of the National Flood Insurance Program before Congress delegated that function to FEMA.

When Hurricane Andrew struck South Florida on August 24, 1992, Garcia's townhouse suffered flood damage, which affected the first, as well as the higher levels, of the residence. Garcia's flood insurance policy with Omaha was then in full force and effect, providing coverage for a term of three years, from May 19, 1992, through May 19, 1995. The flood insurance policy issued by Omaha conforms in every material respect with the Standard Flood Insurance Policy described above, as required by the applicable regulations.

Garcia filed an insurance claim with Omaha to recover the damages resulting from the hurricane. Prior to Omaha's final determination regarding payment of Garcia's claim, FEMA issued a memorandum to "Write Your Own" insurers of L'Hermitage properties directing the insurers to treat those properties as "elevated" buildings when adjusting flood insurance claims for them. Pursuant to the FEMA directive, Omaha denied the portion of Garcia's flood claim pertaining to damages sustained by building components and personal property located on the first floor, which are not covered for post-FIRM elevated buildings, under the above-cited provisions of the Standard Flood Insurance Policy.[3]

At all times during his residence at the townhouse, Garcia used the first level of his townhouse as living space, not for storage. As used by Garcia, this floor included a garage, carport, bedroom, bathroom, and living room. The building plans for Garcia's townhouse, however, show the following designations for the various areas comprising the first floor: garage, carport, bathroom, laundry area, storage area, and multipurpose area. Moreover, a post-hurricane elevation survey of the property, commissioned by Omaha in connection with this action, provides the following information for the property: FIRM Zone "AE;" base flood elevation +13 feet; ground level elevation +5.7 feet; second level elevation +16 feet.

The declarations page for the policy in effect at the time of the loss, however, contains the following information. The property description with respect to the building is "three or more floor with no basement, a single family residence." The property description with respect to contents is "household contents located on the first floor and above." The rating information shown on the declarations page is as follows: FIRM Zone "AE;" construction date prior to 12/31/74; low elevation +16.0 feet; base elevation +12.0 feet; elevation difference +4 feet.[4]

Of particular importance in this action, the declarations page also shows the notation "non-elevated building," below the building description. The Court's review of earlier declarations pages for Garcia's previous flood insurance policies, dating back to 1984 (the year when Garcia acquired the property), reveals that this notation does not appear in any of the declarations pages issued by the National Flood Insurance Program. The notation first appears in the Omaha declarations page for the policy term beginning May 19, 1989 and ending May 19, 1992. As previously noted, Garcia's policy was rolled over to Omaha in 1989.

## DISCUSSION

### 1. Coverage:

■ At the heart of this controversy is FEMA's post-hurricane classification of Garcia's townhouse as an "elevated" building. Garcia argues, based on the notation in the declarations page, that the building is "non-elevated," and that, under this classification, he is entitled to full payment on his claim. Garcia's argument is flawed. Were the Court to consider the building as "non-elevated," Garcia would not be entitled to any payment whatsoever on his claim, since a non-elevated post-FIRM building, located within FIRM Zone AE, violates the commu-

---

3. The parties do not dispute that Garcia's townhouse is a post-FIRM building. *See also Carneiro da Cunha v. Standard Fire Ins. Co.,* Case No. 93–1570–CIV–UNGARO–BENAGES (S.D.Fla. Sept. 6, 1994), at 5 n. 1 (The townhouses at L'Hermitage are post-FIRM buildings.).

4. The Court notes a difference of one foot between the survey's base flood elevation and the comparable figure on the declarations page. This discrepancy is not material to the issues before the Court.

nity flood plain management regulations mandated by the National Flood Insurance Program. This outcome is supported by Judge King's opinion in *Kelly v. Standard Fire Ins. Co.*, Case No. 93–1916–CIV–KING (S.D.Fla. Sept. 19, 1994). In that case, as here, the plaintiff used the first level of his L'Hermitage townhouse, which had an elevation of eight feet, as a living area. The court found that the insurance policy, which was based on a low elevation level of 15.31 feet, was void for mutual mistake, and ordered the plaintiff to return the advance he had received on his hurricane-related insurance claim and the insurance company to return all premiums paid on the policy. Omaha does not advocate, and the Court declines to reach, such a harsh result in this case.

■ Alternatively, Garcia asks the Court to find an ambiguity in the insurance policy and to construe such ambiguity against Omaha. Garcia's ambiguity argument is two-pronged. First, Garcia argues that the exclusion provision for elevated post-FIRM buildings contained in the Standard Flood Insurance Policy is ambiguous. In support of this argument, Garcia has submitted the affidavit of Ronald B. Newman, Ph.D., an expert in the area of readability of the English language. The Court does not find Dr. Newman's analysis persuasive. Indeed, other courts, which have analyzed this exclusion provision, have found it to be unambiguous. *See e.g., Nelson v. Becton*, 929 F.2d 1287, 1288–89 (8th Cir.1991); *Goldman v. Witt*, Case No. 93–5542 (AET) (D.N.J. Dec. 6, 1994). Like the *Nelson* and *Goldman* courts, the Court finds that the exclusion provision for post-FIRM elevated buildings is clear and unambiguous.[5]

■ In the second prong of his ambiguity argument, Garcia contends that the "non-elevated" notation on the declarations page creates an ambiguity vis-a-vis the rating information contained in that same page, and that such ambiguity should be construed against Omaha. This approach was adopted by Judge Ungaro–Benages, with respect to some of the plaintiffs, in the consolidated cases captioned under *Carneiro da Cunha v. Standard Fire Ins. Co.*, Case No. 93–1570–CIV–UNGARO–BENAGES (S.D.Fla. Sept. 6, 1994). Like the declarations page for Garcia's townhouse, the declarations pages for those plaintiffs' L'Hermitage townhouses included the notation "non-elevated building." The rating information for those policies was essentially the same as for Garcia's policy (base elevation +12, low elevation +16, elevation difference +4). The court found that an ambiguity was created by the presence of both elevation figures and the "non-elevated" notation on the declarations page. Construing the ambiguity against the insurer, the court concluded that the buildings were regarded as non-elevated at the time the hurricane struck, so that the exclusion provision for elevated buildings prescribed by the Standard Flood Insurance Policy did not apply. The Court respectfully disagrees with this conclusion.

The declarations page is defined in the Standard Flood Insurance Policy as "a computer generated summary of information furnished by [the insured] in the application for insurance." *Standard Flood Insurance Policy*, 44 C.F.R. Pt. 61, App. A(1), Article 2 (1994). The juxtaposition of elevation data and the notation "non-elevated building" on the declarations page presents a contradiction regarding the character of Garcia's property. As previously discussed, such a contradiction in the factual predicate for issuance of the policy should result in voiding the policy, not in providing coverage that is excluded by the clear terms of the policy.

Moreover, a "Special Notice" appended to Omaha's standard flood insurance policy charges Garcia with the ongoing duty of insuring the accuracy of the information on the declarations page. The notice states:

> The insurance coverage provided to you and the premium are based on the description of the property contained on your

---

5. *But see, Holtz v. Omaha Property & Casualty Ins. Co.*, Case No. 93–2439–CIV–HURLEY (S.D.Fla. May 19, 1994) (Bandstra, Magistrate Judge) (finding an ambiguity in the exclusion clause arising from the use of the terms "base-

ment" and "enclosure lower than the lowest elevated floor"). The Court does not find Magistrate Judge Bandstra's analysis of this issue persuasive.

current policy. View the computer printed Policy Declaration page, which recites the information you have furnished to us, to make sure the information is correct. Your insurance protection can be jeopardized if you have made alterations or substantial improvements to your building which are not reflected on the policy and which are in violation of your community's floodplain management ordinances. This includes such modifications as changing an unfinished basement into a totally or partially finished basement or enclosing an area beneath the lowest floor of an elevated building.

Omaha Standard Flood Insurance Policy, at 8. As previously noted, the notation "non-elevated building" did not appear in the declarations pages for Garcia's succeeding policies until the policy was rolled over to Omaha in 1989. Garcia, however, took no steps to correct this new entry on the declarations page. In addition, the original plans for Garcia's townhouse did not show any living areas on the first level. The declarations pages dating back to Garcia's acquisition of the property showed the lowest elevation at +16 feet, an elevation higher than the first level. Again, Garcia took no steps to correct the declarations page to reflect the fact that the lowest level in use at his residence was not at an elevation of +16 feet. A determination that Omaha must provide full coverage for the flood damage to Garcia's first level would reward Garcia for failing to correct the inaccurate information reflected in the declarations page, in contravention of the policy terms. The Court declines to adopt such an approach.

■ Finally, Garcia argues that Omaha is estopped from denying coverage because Garcia's 1984 flood insurance claim was paid by the National Flood Insurance Program. In *Goldman v. Witt*, Case No. 93–5542 (AET) (D.N.J. Dec. 6, 1994), the court rejected a similar argument. Adopting the *Goldman* rationale, the Court concludes that the fact that Garcia may have improperly received funds from the government-run flood insurance program on his prior claim should not bar the present insurer, Omaha, from properly assessing Garcia's present claim. Thus, the Court concludes that no additional coverage, other than that afforded by Omaha in conformance with FEMA's directive, is available under Garcia's policy, and that Omaha did not breach the insurance contract.

*Claims arising from agent's conduct:*

■ In addition to his declaratory judgment and breach of contract claims, Garcia asserts two claims arising from Tanenbaum's allegedly negligent role in the procurement of the flood insurance policy. Garcia seeks to hold Tanenbaum liable for negligent representations and omissions. Garcia also claims that Omaha is liable for the negligence of its agent, Tanenbaum. The Court has determined that no additional coverage is available for the first level of Garcia's townhouse under the clear guidelines of the National Flood Insurance Program and pertinent regulations. Moreover, the only source of flood insurance is the National Flood Insurance Program, which prescribes the coverage available either directly from the government or through "Write Your Own" private insurers. Because Garcia could not have obtained additional flood coverage for the first level, regardless of Tanenbaum's conduct, Garcia's loss could not have been caused by the alleged negligence of Tanenbaum. Therefore, Garcia's claims against Omaha and Tanenbaum, which are predicated on Tanenbaum's alleged negligence, fail due to the absence of causation.

### CONCLUSION

Based on the foregoing considerations, it is hereby ORDERED AND ADJUDGED as follows:

(1) Garcia's motion for summary judgment (D.E. # 48) is DENIED;

(2) Omaha's cross-motion for summary judgment (D.E. # 60) is GRANTED; and

(3) Tanenbaum's cross-motion for summary judgment (D.E. # 65) is GRANTED.

In accordance with *Fed.R.Civ.P.* 58, the Court shall issue judgment in favor of Omaha and Tanenbaum, and against Garcia, by separate order. In light of this determination,

the Court shall also dismiss Tanenbaum's indemnity crossclaim against Omaha.

DONE AND ORDERED.